OF COUNSEL
Edward W. Miller
LIFSHITZ & MILLER
821 Franklin Ave., Suite 209
Garden City, NY 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
ewm@jlclasslaw.com
joshualifshitz@jlclasslaw.com

Marc G. Reich (SBN 159936)
Email: mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
Email: adhoover@reichradcliffe.com
REICH RADCLIFFE & KUTTLER LLP
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
Phone: (949) 975-0512
Facsimile: (949) 975-0514

Attorneys for Plaintiff
STEVE ROOF

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| STEVE ROOF, an individual,<br><br>Plaintiff,<br><br>v.<br><br>STERLING C. SCOTT, an individual; MARCO HEGYI, an individual; ROB HUNT, an individual; ANTHONY CIABATTONI, an individual; and JEFF GIARRAPUTO, an individual,<br><br>Defendants,<br><br>and<br><br>GROW LIFE, INC., a Delaware corporation<br><br>Nominal Defendant. | Case No: 2:14-cv-03777<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Steve Roof, by and through his undersigned attorneys, brings this derivative complaint (the "Complaint") for the benefit of nominal defendant GrowLife, Inc. ("GrowLife" or the "Company"), against its Board of Directors seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

1. Nominal Defendant GrowLife is a Delaware corporation headquartered in Woodland Hills, California. It designs, manufactures and sells a variety of products utilized by cultivators of legal marijuana.

2. On March 31, 2014, GrowLife issued compensation in the form of stock with a value of $1.1 million to two members of management, Chief Executive Officer Sterling Scott and Chief Financial Officer John Genesi (who was appointed in July 2013), and paid directors Tony Ciabatonni, Jeff Giarraputo, Eric Shevin (former director), and Alan Hammer (former director) 500,000 shares each. This was reported in the Company's Form 10-K for the year ended 2013 (the "2013 Form 10-K") filed with the Securities Exchange Commission ("SEC"). The shares were issued at an average price of $0.02 per share which constitutes a 97% discount to the then trading price (of $0.58).

3. GrowLife posted a $21 million loss for 2013 (ten times its 2012 loss) on total revenues of $4.9 million in sales, while paying $5.3 million in interest, despite its valuation of over $430 million based on 865.1 million fully diluted shares outstanding. Thus, the payments made to insiders on March 31, 2014 were over 50% of the Company's total gross sales for the preceding year.

4. These huge payments, at a time when the Company's profitability had dramatically deteriorated year-over-year, were an act of outrageous self-dealing not in the interest of the Company. Defendants evidently appreciated the illegitimate nature of the payments and attempted to conceal them from the investors by reporting the payments in the Company's 2013 10-K, which valued the share payments utilizing

historically low rather than current share prices apparently so as to camouflage the outrageous size of the unearned payments.

5. The wrongful payments of shares at a huge discount to current trading prices were accompanied by a flurry of insider sales. On April 4, 2014, GrowLife President Robert Hunt sold 1.8 million shares and CEO Scott sold 5.7 million shares for his wife (Wedam Elisabeth) on April 9, 2014, all at $0.50 per share or more.

6. Also reflecting Defendants' efforts to conceal their wrongdoing from investors, by March 31, 2014, four insiders had not filed Form 3's on a timely basis and 11 of 15 insiders had not filed Form 4's on a timely basis. Only a few days later on April 9, 2014, Eric Shevin (Director) resigned from the Board, which afforded him the ability to liquidate his holdings without any requirement to file insider transactions.

7. The camouflaged payments to management members and suspiciously well timed insider sales of GrowLife shares led the SEC to halt trading of GrowLife stock on April 10, 2014 - the day after CEO Scott's huge sale of shares because, "questions that have been raised about the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in PHOT's common stock."

8. On this news, GrowLife shares dropped over 80% from $0.50 cents a share before the April 10, 2014 announcement to approximately $0.12 cents a share within days of the resumption of trading on April 25, 2014. In short, Defendants' manipulative transactions have permanently damaged the business, including major partners walking away from intended transactions with GrowLife. Defendants' machinations have slashed the value of its stock and put into question the long term viability of the Company.

9. Having been caught with their hands in the cookie jar after the SEC stopped trading on GrowLife stock, directors Shevin, Hammer, Ciabattoni, and, Giarraputo relinquished their shares.

10. As a result of Defendants' breaches, the Company has been sued in securities class actions and otherwise damaged.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 in that there is complete diversity between the parties and the matter in controversy exceeds $75,000. Nominal Defendant GrowLife is a citizen of California as it has its principal place of business located at 20301 Ventura Blvd, Suite 126 Woodland Hills, CA 91364 and Plaintiff is a citizen of the State of Ohio.

12. Venue is proper in this Court because GrowLife maintains executive offices in this District, and the Individual Defendants have received substantial compensation in this District by doing business and engaging in numerous activities that had an effect in this District.

13. Venue is proper in this County because the acts, practices, and transactions pleaded herein occurred and were affected to a major extent within this County, GrowLife maintains executive offices in this District, and the Individual Defendants have received substantial compensation in this District by doing business and engaging in numerous activities that had an effect in this District.

## THE PARTIES

14. Plaintiff Steve Roof was a shareholder of GrowLife at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current GrowLife shareholder.

15. Nominal Defendant GrowLife is a Delaware corporation headquartered in Woodland Hills, California. It designs, manufactures and sells indoor gardening products, such as grow room equipment, plant growing systems as well as a line of accessories, including nutrients, media, timers, and controls, LED grow light products for indoor horticulture, mini-greenhouses, and other related products, primarily for the growing of medical marijuana. GrowLife's common stock was actively traded on OTCQB, under the ticker "PHOT." GrowLife distributes and sells its products through on-line distribution channels, such as Greners.com and through its seven retail storefronts.

16. Defendant Sterling C. Scott ("Scott") has been the Company's Chief Executive Officer, President, Secretary and a member of its Board of Directors ("Board") since April 2012.

17. Defendant Marco Hegyi ("Hegyi") has been the Company's President and a member of its Board since December 2013.

18. Defendant Rob Hunt ("Hunt") has been the Company's Executive Vice President and a member of its board since June 2013.

19. Defendant Anthony Ciabattoni ("Ciabattoni") has been a member of the Company's Board since December 2013.

20. Defendant Jeff Giarraputo ("Giarraputo") has been a member of the Company's Board since December 2013.

21. Defendants Scott, Hegyi, Hunt, Ciabattoni, and Giarraputo make up GrowLife's present five member board of directors and are collectively referred to hereinafter as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

22. Until April 30, 2014 the GrowLife Board of Directors operated with no committees whatsoever and in such a fashion that specific oversight duties and responsibilities were never delegated and never meaningfully performed.

23. As detailed below, it was only after the SEC intervened on April 10, 2014 and suspended trading of GrowLife securities due to "questions that have been raised about the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in GrowLife's common stock," that GrowLife on April 30, 2014 announced that its Board of Directors had formed an Audit Committee, Compensation Committee, Nominating Committee and Mergers and Acquisitions Committee "to provide oversight."

24. The Individual Defendants made a number of false statements in SEC filings. With regards to the issuance of its common stock for services rendered, the Company stated in its 2013 3Q 10-Q, in relevant parts:

> During the twelve month period ended December 31, 2013, the Company issued 44,150,110 shares of its common stock for services rendered and wages to its employees. These shares were valued at $1,428,636 and are detailed as follows:
>
> **Shares for Services**
>
> | | |
> |---|---|
> | Wages paid to Company employees | 238,208 |
> | Consulting | 566,333 |
> | Cannabis.org expenses | 29,334 |
> | GrowLife Productions expenses | 65,000 |
> | Public/Investor relations | 221,700 |
> | Product/inventory acquired | 18,172 |
> | **Board Member compensation** | **35,000** |
> | | $1,173,747 |

25. The Company also represents in its 2013 3Q 10-Q that it issued one million shares of its common stock to its Board Members as compensation and expensed the issuance at $0.02 per share, stating in relevant parts:

> On September 30, 2013, the Company issued 1,000,000 shares of its common stock to its two (2) independent members of the Company's Board of Directors. These shares were issued on a non-cash basis and were compensation for services rendered during the April – June 2013 period. These shares were valued at $20,000 in the aggregate and $0.02 per share.
> [Emphasis added.]

26. By valuing the shares issued to directors at far below current market prices, Defendants camouflaged, misreported and understated the actual value of the above payments by a factor of twenty - or close to a half million dollars.

27. As seen below, this same method of underreporting payments of stocks to insiders by valuing the payments at far below current prices, was a modus operandi utilized by Defendants to conceal from investors, the general public, and the SEC their transfer of millions of dollars in unearned and inappropriate payments to themselves.

28. The 2013 3Q 10-Q was signed by Defendant Scott. Accompanying the 2013 3Q 10-Q were separately executed Sarbanes-Oxley Act ("SOX") certifications of Defendants Scott falsely attesting to the accuracy of the 2013 3Q 10-Q.

29. On March 31, 2014, GrowLife filed a Form 10-K for the fiscal year ended December 31, 2013 ("2013 10-K") with the SEC. With regards to the issuance of its common stock for services, the Company stated in its 2013 10-K, in relevant part:

> During the twelve month period ended December 31, 2013, the Company issued 44,150,110 shares of its common stock for services rendered and wages to its employees. These shares were valued at $1,428,636 and are detailed as follows:
>
> **Shares for Services**
>
> | | |
> |---|---|
> | Wages paid to Company employees | $369,875 |
> | Consulting | 551,333 |
> | Cannabis.org expenses | 29,334 |
> | GrowLife Productions expenses | 65,000 |
> | Public/Investor relations | 321,700 |
> | Product/inventory acquired | 18,172 |
> | Board Member compensation | 73,222 |
> | | $1,428,636 |
>
> [Emphasis added.]

30. The Company represented in its 2013 10-K that it issued 10.5 million shares of its common stock to its officers as compensation and expensed the issuance at $0.01 per share, stating in relevant parts:

> ***In March 2013, the Company issued 2,500,000 shares of its common stock to Sterling Scott***, the Company's Chief Executive Officer, as consideration for services provided to the Company. These shares represent an installment due to Mr. Scott in relation to a Board grant from August 2012. ***The shares were valued at $25,000 in the aggregate.***
>
> ***In March 2013, the Company issued 2,000,000 shares of its common stock to Justin Manns***, the Company's former Chief Financial Officer, a former member of the Company's Board of Directors, and the current Controller of GrowLife Hydroponics, Inc. The shares were issued as consideration for services provided to the Company. These shares represent an installment due to Mr. Manns in relation to a Board grant from August 2012***. The shares were valued at $20,000 in the aggregate.***

> ***In November 2013, the Company issued 3,333,333 shares of its common stock to Sterling Scott***, the Company's Chief Executive Officer, as consideration for services provided to the Company. These shares represent the final installment due to Mr. Scott in relation to a Board grant from August 2012. ***The shares were valued at $33,333 in the aggregate***.
>
> ***In November 2013, the Company issued 2,666,667 shares of its common stock to Justin Manns***, the Company's former Chief Financial Officer, a former member of the Company's Board of Directors, and the current Controller of GrowLife Hydroponics, Inc. The shares were issued as consideration for services provided to the Company. These shares represent the final installment due to Mr. Manns in relation to a Board grant from August 2012***. The shares were valued at $26,667 in the aggregate.***
>
> [Emphasis added.]

31. The Company explained in its 2013 10-K that it issued approximately 3.9 million shares of its common stock to its Board Members as compensation and expensed the issuance at $0.02 per share, stating in relevant parts:

> During the twelve months ended December 31, 2013, the Company issued 1,500,000 shares of its common stock to Eric Shevin, an independent member of the Company's Board of Directors, as consideration for his service as a Board member from April 1, 2013 through December 31, 2013. The shares were valued at $30,000 in the aggregate.
>
> During the twelve months ended December 31, 2013, the Company issued 1,683,333 shares of its common stock to Bob Kurilko, a former independent member of the Company's Board of Directors, as consideration for his service as a Board member from January 1, 2013 through November 2, 2013. The shares were valued at $33,667 in the aggregate.
>
> During the twelve months ended December 31, 2013, the Company issued 500,000 shares of its common stock to Craig Ellins, a former independent member of the Company's Board of Directors, as consideration for his service as a Board member from January 1, 2013 through March 31, 2013. The shares were valued at $10,000 in the aggregate.
>
> On December 31, 2013, the Company issued 83,333 shares of its common stock to Alan Hammer, an independent member of the

> Company's Board of Directors, as consideration for his service as a Board member from December 17, 2013 through December 31, 2013. The shares were valued at $1,667 in the aggregate.
>
> On December 31, 2013, the Company issued 72,222 shares of its common stock to Anthony Ciabattoni, an independent member of the Company's Board of Directors, as consideration for his service as a Board member from December 19, 2013 through December 31, 2013. The shares were valued at $1,444 in the aggregate. Mr. Ciabattoni's shares have been issued to the Ciabattoni Living Trust, of which Mr. Ciabattoni is the Trustee.
>
> On December 31, 2013, the Company issued 72,222 shares of its common stock to Jeff Giarraputo, an independent member of the Company's Board of Directors, as consideration for his service as a Board member from December 19, 2013 through December 31, 2013. The shares were valued at $1,444 in the aggregate.
>
> Commencing in August 2012, outside board members were awarded 2,000,000 shares per year which vest quarterly.
>
> [Emphasis added.]

32. The Company also disclosed under the Subsequent Events section in its 2013 10-K that it issued 2.0 million shares of its common stock to its Board Members for services rendered during the first quarter of 2014 and expensed the issuance at $0.02 per share, stating in relevant parts:

> On March 31, 2014, the Company issued 500,000 shares, 2,000,000 shares in the aggregate, to each of its four (4) independent Board members as compensation for their Board service for the January 1, 2014 through March 31, 2014 period. The shares were valued at $0.02 per share and $40,000 in the aggregate and were issued in accordance with an August 2012 Board grant. The four independent Board members are Eric Shevin, Alan Hammer, Tony Ciabatonni, and Jeff Giarraputo.
>
> [Emphasis added.]

33. The 2013 10-K was signed by Defendants Scott, Genesi, Hegyi, Hunt, Hammer, Giarraputo, and Ciabattoni. Accompanying the 2013 10-K were separately executed SOX certifications of Defendants Scott falsely attesting to the accuracy of the 2013 10-K.

34. On April 9, 2014, the Company filed a Form 8-K with the SEC announcing the abrupt resignation of Eric Shevin as a Board Member, which was

effective as of April 1, 2014. The day after Shevin's resignation the SEC announced the temporary trading suspension of the Company's stock. The announcement states in relevant parts:

> SECURITIES EXCHANGE ACT OF 1934 Release No. 71924/ April 10, 2014
>
> The U.S. Securities and Exchange Commission announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading of the securities of GrowLife, Inc. ("PHOT"), of Woodland Hills, California at 9:30 a.m. EDT on April 10, 2014, and terminating at 11:59 p.m. EDT on April 24, 2014.
>
> The Commission temporarily suspended trading in the securities of PHOT because of questions that have been raised about the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in PHOT's common stock.
>
> [Emphasis added.]

35. April 11, 2014, Creative Edge Nutrition, Inc., CEN Biotech and RXNB announced the termination of their agreement with GrowLife in light of the SEC's trading suspension. The announcement states in relevant parts:

> MADISON HEIGHTS, MI--(Marketwired - Apr 11, 2014) - Creative Edge Nutrition, Inc. (OTC Pink: FITX) (PINKSHEETS: FITX), CEN Biotech and RXNB board of directors have decided to rescind the agreement between CEN Biotech, RXNB, GrowLife and OGI.
>
> The Company has learned today that the U.S. Securities and Exchange Commission has suspended trading in the securities of GrowLife due to questions that have been raised about the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in GrowLife's common stock. In light of this development and other contributing factors, RXNB and CEN Biotech have advised the CEO of GrowLife and the Board of OGI that both the RXNB Agreement and the CEN Biotech Agreement, and any and all amendments to those agreements, are rescinded, void and of no further force and effect.

36. On that same day, analyst Rolling O Research published a report revealing inaccuracies with the Company's SEC filings, stating in relevant parts:

> Looking at the Subsequent Event "future charges" shown above, the understatement would be even more astounding, due to the increase in PHOT's stock price during the quarter (assuming this is not corrected in the 10-Q for 1Q/14). On March 31, 2014, PHOT closed at $0.5795. Therefore, the 500 thousand share payments to each of the four directors, while being listed by GrowLife as $40 thousand expense (at $0.02), should be recorded as a $1.159 million charge.
>
> That's a difference of $1.1M!
>
> [Emphasis added.]

37. Upon this news, when trading of the Company's stock resumed on April 25, 2014, shares of GrowLife declined by as much as $0.27 per share, or 54%, to $0.23 per share during intraday trading and in the following several days fell to $0.12 per share. The stock is presently, as of May 13, 2014, trading at $0.10 per share.

38. The Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated GrowLife's stock price and operated as a fraud or deceit on purchasers of GrowLife stock by misrepresenting the Company's business. Once the Individual Defendants' misrepresentations and fraudulent conduct were disclosed to the market, GrowLife's stock price reacted negatively as the artificial inflation was removed from it.

39. On April 25, 2014, GrowLife and former Director Shevin and Defendants Hammer, Ciambattoni and Giarraputo entered into four separate Restricted Stock Cancellation Agreements pursuant to which the Directors agreed to each cancel 500,000 shares of the Company's restricted common stock granted to each Director in Q1 2014. The Restricted Stock was granted as part of a quarterly independent director compensation plan instituted by resolution of the board of directors in August 2012. Upon execution of the Agreements, all rights to or under the Restricted Stock by the Directors was terminated and said Restricted Stock was canceled and delivered back to the Company.

## DAMAGES TO THE COMPANY

40. GrowLife has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct. As a direct and proximate result of the Individual Defendants' conduct, GrowLife has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. Costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

b. Substantial loss of market capital;

c. Costs already incurred defending against the pending securities class actions, and potential liability therefrom; and

d. GrowLife's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.

41. The actions complained of herein have irreparably damaged GrowLife's corporate image and goodwill. For at least the foreseeable future, GrowLife will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that GrowLife's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEFENDANTS' DUTIES

42. By reason of their positions as officers, directors, and/or fiduciaries of GrowLife and because of their ability to control the business and corporate affairs of GrowLife, the Individual Defendants owed GrowLife and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage GrowLife in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GrowLife and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to GrowLife and its shareholders the fiduciary duty to exercise good

faith and loyalty and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43. The Individual Defendants, because of their positions of control and authority as directors and/or officers of GrowLife, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with GrowLife, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

44. To discharge their duties, the officers and directors of GrowLife were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of GrowLife were required to, among other things:

a. Exercise good faith and loyalty to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith and loyalty to ensure that the Company was operated in a prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c. Exercise good faith and loyalty to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

d. When put on notice of problems with the Company's business practices and operations, exercise good faith and loyalty in taking appropriate action to correct the misconduct and prevent its recurrence.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

45. A pre-suit demand on the GrowLife Board was futile, and therefore, excused because three of the Company's five directors are employees and executives of the Company who receive significant income from the Company, and all six directors/Defendants face a sufficiently substantial likelihood of liability in the present claim to render them non-impartial to consider demand.

46. As of May 15, 2014, when this action was filed, the Board of GrowLife consisted of the following six individuals: Defendants Sterling C. Scott, Marco Hegyi, Rob Hunt, Anthony Ciabattoni, and Jeff Giarraputo.

47. Defendant Hegyi is the President of GrowLife and as such, he derives significant income from his employment at the Company and his professional reputation is inextricably bound to his role at GrowLife. As such demand would be futile upon him.

48. Defendant Scott is the Chairman, Chief Executive Officer and Secretary of GrowLife, since April 5, 2012 and served as its President and Chief Financial Officer from April 2012 to June 28, 2012. In 2013 Defendant Scott received a total of $615,933 in salary and stock and option awards. As such, Defendant Scott derives significant income from his employment at the Company and his professional reputation is inextricably bound to his role at GrowLife and it would be futile to make demand upon him.

49. Defendant Hunt is the Executive Vice President of GrowLife and derives significant income from his employment at GrowLife and his professional reputation is inextricably bound to his role at GrowLife and it would be futile to make demand upon him.

50. All the Individual Defendants face a sufficiently substantial likelihood of liability to render them interested since, as detailed below, the Individual Defendants had full knowledge that the payments they received were unearned and improper and were being misreported and concealed from shareholders, the SEC and the general

public though intentionally false and misleading statements in the Company's 2013 10-K.

51. In so doing, the Individual Defendants exposed the Company to severe damage and injury. Consequently, the Individual Defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore excused.

52. Defendants Hunt and Scott additionally face a sufficient substantial likelihood of liability for trading on insider information as detailed herein.

**COUNT I**

**WILLFUL BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**

53. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

54. Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GrowLife's business and affairs, particularly with respect to issues so fundamental as compliance with laws and regulation and regulatory body and shareholder reporting.

55. Defendants' conduct set forth herein was due to their knowing breach of the fiduciary duties and the duty of loyalty they owed to the Company. Defendants were aware that they were taking payments that were unearned and improper and intentionally misreported the value of those payments to conceal them from shareholders.

56. Defendants' conduct set forth herein was due to their knowing breach of the fiduciary duties and the duty of loyalty they owed to the Company. Defendants were aware of and participated in GrowLife's failure to disclose material information and making of false and misleading statements to the SEC, investors, and the general public. In this fashion Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of GrowLife.

57. In breach of their fiduciary duties owed to GrowLife, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds and will cause the future unnecessary expenditure of corporate funds to defend and pay in connection with litigation brought against the Company due to the above detailed conscious malfeasance and misfeasance of the Defendants, rendering them personally liable to the Company for breaching their fiduciary duties.

58. As a direct and proximate result of defendants' breaches of their fiduciary obligations, GrowLife has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT II**

**ABUSE OF CONTROL**

59. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

60. Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GrowLife, for which they are legally responsible.

61. As a direct and proximate result of defendants' abuse of control, GrowLife has sustained significant damages. In particular, Defendants abused their positions of authority by causing or allowing GrowLife to misrepresent material facts regarding its financial position and business prospects.

62. As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, GrowLife has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

63. As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, GrowLife has sustained damages.

## COUNT III

## UNJUST ENRICHMENT

64. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65. By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of GrowLife.

66. Plaintiff, as a shareholder and representative of GrowLife, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV

## AGAINST DEFENDANTS HUNT AND SCOTT FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

67. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68. At the time of the stock sales set forth herein in April, 2014, Defendants Hunt and Scott were in possession of material, adverse, non-public information described above and knew that the current share price levels were not sustainable and sold GrowLife common stock on the basis of such information.

69. The insider information was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which Defendants Hunt and Scott used for their own benefit when they sold GrowLife common stock.

70. Defendants Hunt and Scott's stock sales while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

71. Despite having insider knowledge and knowing that the stock price was artificially inflated, on April 3, 2014 Defendants Hunt sold over two million shares at $0.56 to $0.59 for over $1 million, and on April 7, 2014 Defendant Scott sold 5,735,881 shares at $0.50 for $2,867,940.

72. Defendants Hunt and Scott willingly, wantonly, and maliciously used this insider information to sell their stocks and grossed nearly $4 million collectively, and the price has since dropped to $0.12 a share.

73. Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Hunt and Scott’s fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendants Hunt and Scott obtained thereby.

74. Plaintiff, on behalf of GrowLife, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, plaintiff demands judgment in the Company's favor against all defendants as follows:

A. Declaring that plaintiff may maintain this action on behalf of GrowLife and that plaintiff is a adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to GrowLife;

C. Determining and awarding to GrowLife the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D. Directing GrowLife and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures, including, but not limited to the appointment of an independent panel of three outside directors to investigate and report upon the above described payments and to issue a report thereon with recommendations for revised compensation procedures and standards to prevent such payments in the future;

E. Determining and awarding to GrowLife exemplary damages in an amount necessary to punish the defendants and to make an example of defendants to the community according to proof at trial;

F. Awarding GrowLife restitution from each of the defendants;

G. Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: May 15, 2014

REICH RADCLIFFE & KUTTLER LLP

By: /s/ Adam T. Hoover
Marc G. Reich
Adam T. Hoover
Attorneys for Plaintiff
STEVE ROOF